# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| KEVIN GREENWOOD, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 17-cv-3745 |
| | ) | |
| v. | ) | Hon. Jorge L. Alonso |
| | ) | |
| NATIONWIDE MUTUAL | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

After he was discharged from his position as a Trial Attorney with defendant Nationwide Mutual Insurance Company ("Nationwide"), plaintiff Kevin Greenwood ("Greenwood") filed in the Circuit Court of Cook County a three-count complaint in which he alleged Nationwide failed to provide a reasonable accommodation (Count I), as well as discriminated (Count II) and retaliated (Count III) against him, all in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. 12111, et seq. Defendant removed the case to this Court, and the parties have now filed cross-motions for summary judgment. For the reasons set forth below, the Court denies plaintiff's motion for summary judgment [126]. The Court grants in part and denies in part defendant's motion for summary judgment [111].

## I.     BACKGROUND

The following facts are undisputed unless otherwise noted.[1]

---

[1] Local Rule 56.1 outlines the requirements for the introduction of facts parties would like considered in connection with a motion for summary judgment. The Court enforces Local Rule 56.1 strictly. Where one party supports a fact with admissible evidence and the other party fails to controvert the fact with citation to admissible evidence, the Court deems the fact admitted. *See Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218-19 (7th Cir. 2015); *Ammons v.*

Defendant Nationwide is a mutual insurance company.  Defendant offers property and casualty insurance products to individuals and businesses.  Often, when one of defendant's insureds is sued as a result of an occurrence under one of defendant's policies, defendant defends the insured.  Defendant employs attorneys to represent it in some litigation, rather than always outsourcing litigation to outside law firms.

The attorneys that defendant employs to represent it in litigation are part of its Trial Division.  The Trial Division has a relationship with defendant's internal claims employees (which the Trial Division refers to as its internal clients), as well as with defendant's insureds (which the Trial Division refers to as its external clients).  The Trial Division staffs each case with one attorney, one paralegal and one secretary.  The ultimate responsibility for ensuring timely, quality work product rests with the assigned attorney.  During the relevant time period, defendant employed attorneys in the Trial Division in two offices—one in downtown Chicago and one in Lombard.

Plaintiff Greenwood has been an attorney since he graduated from law school in 1988.  His work experience in the early part of his career included clerking for two judges and working at a law firm in Chicago.  In 1998, plaintiff took a position with defendant as Trial Attorney II.  Three years later, plaintiff was promoted to Trial Attorney III.

---

*Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817-18 (7th Cir. 2004).  This does not, however, absolve the party putting forth the fact of the duty to support the fact with admissible evidence.  *See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012).  The Court does not consider any facts that parties failed to include in their statements of fact, because to do so would rob the other party of the opportunity to show that the fact is disputed.  In reviewing the parties' statements of facts, the Court considers any objections opposing parties make to the admissibility of evidence; but, where a party fails to make an objection, the objection is deemed waived for purposes of these motions for summary judgment.

Defendant expects attorneys with the title of Trial Attorney III to defend its insureds in higher-risk litigation. The responsibilities of the position include: preparing for and representing clients in trials and hearings before courts and agencies; working on complicated legal matters; meeting billable-hour requirements; handling discovery and taking depositions; making and defending motions; developing and maintaining relationships with clients; and following the Trial Division's Best Practices Guidelines to meet the Trial Division's Metrics.

Because of a billable hour requirement, the job description for Trial Attorney III lists "extended hours" as a condition of the job. Defendant expects its Trial Attorneys to bill 150 hours per month and 1800 hours per year. Defendant also keeps track of the number of open files on which each Trial Attorney is working. In counting the files, defendant gives different weights to different types of files, to account for the fact that some types of files require more time to resolve. For example, defendant gives a typical bodily-injury file a weight of one, a typical commercial-claim file a weight of 1.5 and a typical subrogation file a weight of less than one.

As noted above, the job description for Trial Attorney III includes "representing clients in trials and hearings." The parties agree that, at the Circuit Court of Cook County, Judges typically do not allow attorneys to appear by telephone. Plaintiff put forth testimony from a former Trial Attorney at Nationwide who said the essential function of the Trial Attorney job was to represent the client and that representing the client included attending depositions and court hearings. Defendant expects the attorney assigned to a case to attend any motion hearings, pre-trial conferences and trials in that case, and that is typically what happened. With respect to routine status hearings or case-management conferences, however, the attorneys coordinate and sometimes cover each other's cases when necessary. For example, the attorneys have attempted

to avoid sending multiple attorneys to the same courthouse on the same morning. In addition, when one attorney broke her ankle, her Managing Attorney attempted to find other attorneys to cover her court appearances if someone else had to be at that courthouse anyway. In plaintiff's case, he was allowed to have an attorney from the Trial Division in Colorado attend his deposition in Colorado. Plaintiff had ultimate responsibility for all activity on his assigned cases.

As noted above, one of the requirements of the Trial Attorney job was following the Trial Division's Best Practices Guidelines to meet the Trial Division's Metrics. Each Trial Attorney reports to a Managing Attorney, who, among other things, is responsible for evaluating his/her Trial Attorneys' compliance with best practices. One way the Managing Attorneys evaluate compliance is by performing Key Performance Indicator ("KPI") reviews. Specifically, each quarter, each Managing Attorney is responsible for reviewing three random files of each Trial Attorney she supervises to determine how well that Trial Attorney has met the Best Practices Guidelines with respect to those files. Among the Best Practices were deadlines for drafting and providing certain reports to internal claims clients, with the goal of keeping cases moving and keeping the client informed. Managing Attorneys also perform quality assurance reviews ("QARs") every August, and, while the parties do not clarify the nature of the QARs, it is clear (and undisputed) that defendant expects its Trial Attorneys to score at or above 90 on both QARs and on KPI reviews. In 2007, plaintiff's KPI score was 94.21.

After plaintiff had worked for defendant for about a decade, he was diagnosed with vascular disease. The disease caused circulation problems and caused plaintiff's blood to clot. In 2008, doctors amputated plaintiff's right leg below the knee, and, in 2012, doctors amputated the left leg at the same spot. Each time, plaintiff took a short-term disability leave and then returned to his job.

By 2010, plaintiff reported to Managing Attorney Colleen Shiel ("Shiel"). In March 2010, Sheil issued plaintiff a Performance Coaching for three reasons, including that plaintiff's billable hours were too low, that he had failed to arrange face-to-face meetings with clients on a consistent basis and that he had a low weighted-file count. About six months later, Shiel placed plaintiff on a Performance Improvement Plan. As part of that plan, Shiel directed plaintiff to send litigation plans and substantive reports to claims clients in a timely manner, to conduct client meetings in a timely manner, to use technology to improve efficiency and to work on each file at least once every 30-45 days. Plaintiff successfully completed the Performance Improvement Plan. Ultimately, for the year 2010, Shiel rated plaintiff "1-Achieves."

For 2011, plaintiff was rated "3-Good." Plaintiff's manager wrote in his review, "We looked to Kevin to handle a higher volume of cases this year and he answered the call." His KPI score for 2011 was 86.00.

Shiel left Nationwide in September 2012, and, in October 2012, Nationwide hired Todd Schneider as a Managing Attorney. He took over as plaintiff's Managing Attorney and was aware that plaintiff was a double amputee. Schneider also managed two other Trial Attorneys, Michelle Harland ("Harland") and Ed Januszkiewicz ("Januszkiewicz").

For the year 2012, Schneider rated plaintiff "Good." In plaintiff's evaluation, Schneider noted plaintiff's low KPI score of 82.62 and that part of the reason might have been that other attorneys were covering his files while he was on leave (for his second amputation). Schneider also noted that plaintiff worked well with everyone in the office and that his clients were happy with his work.

In July 2013, Schneider provided plaintiff with a report on his metrics. Schneider told plaintiff he had taken a deeper look at some of plaintiff's missed metrics and concluded that they

were not as bad as they appeared.  Schneider said, "Great job—keep up the good work."

Overall, for the year 2013, Schneider rated plaintiff "Good."  In the annual review, Schneider

wrote that plaintiff "appears to demonstrate competencies" in the areas of decision making and

professional knowledge.  Plaintiff's claims surveys (which the parties do not explain but seem to

be surveys sent to claims representatives to evaluate the work of the Trial Attorneys assigned to

their claims) were higher than anyone in the office but still below what defendant expected its

Trial Attorneys to achieve.  His KPI score was 89.84.  That score, however, included work done

by other attorneys, who had covered plaintiff's cases while he was on short-term disability leave

in 2012.  Schneider told plaintiff that, in 2014, plaintiff needed to focus on his metric

compliance, his responsiveness to claims clients and his productivity.

 On or about March 16, 2014, Schneider reminded plaintiff that the end of the third

quarter was approaching.  Schneider informed plaintiff that he needed to bill 7.04 hours each of

the remaining workdays to meet the billable hour requirement.  Schneider added, "Keep up the

good work!!"  That quarter, Schneider met his billable hour requirement, but attorneys Harland

and Januszkiewicz did not.

 Something happened in May 2014 that seems to have upset the apple cart.  Nationwide

employee Timothy McKercher ("McKercher"), who was the head of the Commercial Practice

Group (and who was a liaison between commercial claims and the Trial Division), heard from

Nationwide's Commercial Claims Department that it was dissatisfied with the work of three

attorneys in Chicago.  The internal clients were concerned that commercial claims were "over

the head" of both plaintiff and another attorney, Harland.[2]

---

[2] Plaintiff objected to this evidence on the basis of hearsay, but, while it cannot be considered for
the truth of the matter asserted, it can be considered for other purposes, namely to show the

On June 9, 2014, Schneider sent an email to plaintiff and his team (i.e., his secretary and his paralegal). In it, Schneider set forth an action plan for plaintiff and the team but did not use the words "informal coaching" or "formal coaching." Among other things, plaintiff was required to send his substantive reports to the paralegal and Schneider for review before sending the reports to internal clients. Schneider wanted to receive any reports a day before they were due to internal clients so that he could review them for errors and content before they were sent on. Schneider's goal was to improve the timeliness and content of the reports. Schneider had noticed that some of plaintiff's reports lacked legal analysis and recommendations. Defendant has put forth disputed evidence that plaintiff's prior reports had included typographical errors and incomplete sentences.

Later that month, on June 28, 2014, Schneider performed a KPI review of one of plaintiff's files. Plaintiff's score was 55, far below the requisite 90. At about the same time, Schneider sent plaintiff a metric status report, in which Schneider informed plaintiff that he had "late metrics" in just 4.4 percent of the files assigned to him in the last 360 days. Schneider said, "Nice work!" In July 2014, Schneider performed a KPI review of another one of plaintiff's files. Schneider found punctuation errors and that plaintiff had failed to answer written discovery.

Schneider was also receiving feedback from internal clients. By the end of July 2014, Schneider learned that Nationwide's commercial unit had "no appetite" for having plaintiff or Harland handle their cases. In addition, Schneider learned that internal client Bruce Dilg had "lost confidence" in plaintiff.[3] Based on this information from the internal clients, Schneider removed plaintiff from responsibility for commercial cases. Harland was not removed from

---

effect it had on the hearer. *See Simpson v. Beaver Dam Comm. Hospitals, Inc.* 780 F.3d 784, 796 (7th Cir. 2015).

[3] Footnote 2 applies to this paragraph as well.

commercial cases. Nationwide's Commercial Claims department allowed Harland to continue working on those cases, because her case handling was better than plaintiff's. Harland's QAR results were higher than plaintiff's in 2014. Through June 2014, Harland's QAR score was 95.9, and her KPI score was 95.25. In addition, Harland continued to receive referrals for commercial files from claims representatives in Scottsdale and Harleysville. Plaintiff, on the other hand, was removed from commercial files effective August 11, 2014. Schneider told plaintiff that one reason he was taken off cases from Harleysville is that the internal client preferred her former attorney, and plaintiff would have to take the fall for that.

During that month of August 2014, Schneider twice had to remind plaintiff to provide his reports to Schneider for review before sending them to internal clients.

On September 23, 2014, Schneider issued plaintiff a Written Notice about his performance. In it, Schneider notified plaintiff that he believed plaintiff produced substandard work, failed to move his files aggressively and failed to meet metric standards of best practices. Schneider also noted that plaintiff had been "deselected" (Nationwide's euphemism for being disallowed to work on cases) by internal commercial clients. In the Written Notice, Schneider included twelve performance expectations with respect to which Schneider expected "immediate and ongoing improvement." Among them, Schneider expected plaintiff: (1) to provide timely reports to clients after providing them to Schneider for review at least one day before the deadline; (2) to be proactive in positioning cases for summary judgment; (3) to respond to all emails and phone calls within 24 hours; and (4) to achieve compliance with all metrics.

Over the next several months, Schneider gave plaintiff feedback on his performance. On November 7, 2014, Schneider met with plaintiff and discussed Schneider's perception that plaintiff was not complying with the Written Notice. Schneider also reminded plaintiff he

needed to send reports to Schneider for review before sending them to clients.  On January 6, 2015, Schneider met with plaintiff and discussed Schneider's perception that plaintiff was not complying with the Written Notice.  Schneider reminded plaintiff that he needed to meet clients in person within 60 days of a case referral.

*Other employees*

Plaintiff was not the only attorney whose performance Schneider was attempting to improve in 2014.  During that year, Schneider was also attempting to improve the performance of Januszkiewicz, a Nationwide Trial Attorney assigned to workers' compensation claims. Schneider had placed Januszkiewicz on an informal coaching plan in 2013, before placing him on a formal one in May 2014.  The reasons for the May 2014 plan were that Januszkiewicz had failing KPI and QAR scores, had low scores on claims and client surveys and had billed too few hours.  Januszkiewicz ultimately improved his QAR metric scores to the highest in the office for 2015.  Januszkiewicz was never removed from working on workers' compensation claims due to client complaints.

Around the same time, Schneider was also trying to improve Harland's performance.  In 2014, she had high metric scores (KPI scores above 95) and met her billable hour requirements. Nonetheless, some of Harland's reports were late, and she was "deselected" from some types of claims.  During 2015, Harland maintained her high KPI scores (95.9) and billable hours.  In 2015, she made efforts to improve her legal acumen and judgment and maintained a positive attitude

*Plaintiff's final written warning and requests for accommodation*

In his evaluation for the year 2014, plaintiff received an overall rating of "unsatisfactory."  Plaintiff's evaluation mentions unprofessional letters and reports sent to

internal clients with incomplete sentences and improper grammar. The evaluation also mentions that plaintiff was "deselected" by two commercial insurers, which limited his practice to personal lines cases. On the positive side, plaintiff had met his billable hour requirement by billing 1800.3 hours, and his client scores rated him as fair.

On January 21, 2015, Schneider told plaintiff that his performance was still not meeting Nationwide's expectations. Schneider told plaintiff he was being placed on a 45-day final written notice and that his employment would be terminated if he did not improve his performance by the end of the 45 days. Before Schneider put plaintiff on a final written notice, plaintiff had never suggested to Schneider or to Thomas Coffey ("Coffey"), the regional supervising attorney, that his physical condition was affecting his performance. Nor did Schneider or Coffey think of Schneider's condition as a double amputee with prosthetic legs as an impediment to Schneider's performance as a Trial Attorney.

The following Monday, January 26, 2015, Schneider contacted Nationwide's ADA group to request job accommodations. Plaintiff requested an accommodation because he was tired. Plaintiff had no cognitive challenges that affected his job performance, and he was able to drive; but phantom limb pain was keeping him from sleeping well. Schneider requested three accommodations: (1) that he be allowed to work in the Lombard office (which was closer to his home); (2) that he be allowed to work from home occasionally; and (3) that he be given a week to get caught up. Plaintiff did not ask for assistance typing reports, and he testified that the reason he did not ask for that was that Nationwide expected attorneys to use voice recognition software to assist in writing reports.

The day after Schneider requested accommodations, a nurse specialist asked Schneider for the job description for plaintiff's job. Schneider was not, however, asked what accommodations might work for plaintiff.

Also on January 27, 2015, a nurse specialist advised plaintiff that Lynn Sturm, a nurse, would manage his request for accommodations. Nationwide also sent plaintiff forms to complete. On January 31, 2015, plaintiff provided defendant a statement about his condition. Plaintiff described his prosthetics as being like "walking on stilts," such that he had to be especially careful in winter. Plaintiff stated that it took him longer to get to court, so he has to leave early or take a taxi. Plaintiff also stated that it takes him longer to walk between courtrooms. Plaintiff stated that trips to court leave him physically and mentally exhausted and leave him with less time to do his office work.

In the meantime, Nationwide had also given plaintiff forms to be completed by his physician. The forms asked the physician to provide information about plaintiff's medical condition, about the ways in which plaintiff's condition affects his major life activities and about accommodations that would allow plaintiff to perform his job. On January 30, 2015, plaintiff's doctor, Dr. Pragathi Challa ("Dr. Challa") responded. Dr. Challa wrote that plaintiff needed "accomodati[o]n at work – to do activities" and took "extra/or additional time to do daily activities."

Sturm, the nurse assigned to find accommodations for plaintiff, sought additional information from Dr. Challa. Sturm specifically asked whether two of the accommodations plaintiff requested—working from an office closer to home and working from home during inclement weather—would be appropriate accommodations for plaintiff. Dr. Challa declined to say whether those accommodations would enable plaintiff to perform his job duties. Dr. Challa

noted that those accommodations would help everyone, so she could not sign a form that said they would help plaintiff. Plaintiff told Sturm that Dr. Challa told him it was just common sense. Plaintiff told Sturm he would go with what he had already provided.

In March 2015, Nationwide granted plaintiff two of the three accommodations he requested. First, Nationwide provided work space at the Lombard office. Second, Nationwide permitted plaintiff to work from home as needed, although it required him to attend all in-person court hearings and depositions. Although Nationwide did not provide the third requested accommodation (a week to catch up), it extended his final written notice deadline to April 25, 2015. Sturm's last involvement with plaintiff was when she sent a letter in March outlining the accommodations. Sturm did not follow-up with plaintiff to find out if the accommodations were working or to tell him he could ask for more.

In the meantime, since late January when the final-written-notice period began, Schneider had been providing plaintiff with regular feedback (almost weekly) on his performance. For example, on January 13, 2015, Schneider reviewed a litigation plan report written by plaintiff, found punctuation and spelling errors and rewrote the fact section to make it more clear. On January 30, 2015, Schneider told plaintiff he was short seventeen billable hours for the month, that he had missed a status hearing and that he had missed an internal deadline. On February 6, 2015, Schneider told plaintiff that his most recent KPI score was below passing and called plaintiff out for back-billing to January work performed in February. On February 20, 2015, Schneider noted that plaintiff had been barred from taking a plaintiff's deposition as a discovery sanction for not answering written discovery. Schneider acknowledged that the "answering of discovery is a paralegal task" but said it still falls on the shoulders of the assigned attorney.

In March, plaintiff transitioned to the Lombard office, which, according to plaintiff, was a smooth transition. From March 11 to May 8, 2015, plaintiff had sixteen downtown court appearances on his schedule. On or about May 1, 2015, Schneider informed plaintiff he had failed to meet his billable hour requirement each month of the year. Plaintiff's KPI score for 2015 was 84.33.

Defendant terminated plaintiff's employment on May 13, 2015. Before his employment was terminated, plaintiff did not complain that his performance warnings were unfair or discriminatory.

## II.     STANDARD ON A MOTION FOR SUMMARY JUDGMENT

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). When considering a motion for summary judgment, the Court must construe the evidence and make all reasonable inferences in favor of the non-moving party. *Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1021 (7th Cir. 2018). Summary judgment is appropriate when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial." *Celotex v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).

## III.    DISCUSSION

### A.    Failure to accommodate

In Count I, plaintiff alleges that defendant violated the Americans with Disabilities Act by failing to provide a reasonable accommodation.  The ADA makes it unlawful to "discriminate against a qualified individual on the basis of disability in regard to . . . the . . . discharge of employees . . . and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  Included in the definition of discriminate is "not making reasonable accommodation to the known physical or mental limitations of an otherwise qualified individual with a disability."  42 U.S.C. § 12112(b)(5)(A).  The ADA defines "qualified individual" as meaning "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  That section goes on to say, "[f]or purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job."  42 U.S.C. § 12111(8).

Thus, in order to establish a claim for failure to accommodate, the plaintiff must show: (1) he "is a qualified individual with a disability;" (2) "the employer was aware of the disability;" and (3) "the employer failed to reasonably accommodate the disability."  *Equal Employment Opportunity Comm'n. v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005); *see also Taylor-Novotny v. Health Alliance Medical Plans, Inc.*, 772 F.3d 478, 493 (7th Cir. 2014).  The Seventh Circuit has explained:

> Identifying reasonable accommodations for a disabled employee requires both
> employer and employee to engage in a flexible, interactive process.  Both parties

14

> are responsible for that process. If a reasonable accommodation was available but the employer prevented its identification by failing to engage in the interactive process, that failure is actionable. On the other hand, if the employee 'does not provide sufficient information to the employer to determine the necessary accommodations, the employer cannot be held liable for failing to accommodate the disabled employee.'

*Brown v. Milwaukee Bd. of School Directors*, 855 F.3d 818, 821 (7th Cir. 2017) (internal citations omitted). The parties seem to agree that plaintiff has a disability within the meaning of the statute. The parties disagree, however, on whether defendant provided a reasonable accommodation.

It is clear to this Court, however, that plaintiff has not put forth sufficient evidence from which a reasonable jury could conclude that defendant failed to provide a reasonable accommodation. "An employer is not obligated to provide an employee the accommodation he requests or prefers, the employer need only provide some reasonable accommodation." *Gratzl v. Office of Chief Judges*, 601 F.3d 674, 681-82 (7th Cir 2010) (quoting *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 546 (7th Cir. 2008); *Gile v. United Airlines*, 95 F.3d 492, 499 (7th Cir. 1996)).

Defendant provided two of the three accommodations plaintiff requested. Specifically, defendant allowed plaintiff to work in the Lombard office and to work at home, occasionally. These accommodations are reasonable, because they address the difficulties plaintiff had with his job due to his disability. Plaintiff had no cognitive problems with his job, but it took him longer to get to court. Also, his phantom limb pain left him tired. Allowing him to work at an office closer to home (and sometimes at home) addressed these issues by making his commute shorter, thus allowing more time for completing his work and for rest. Defendant did not provide the third requested accommodation, one week to catch up. Plaintiff has not shown, however, that that accommodation would have been effective. It was a temporary band aid for a permanent problem.

Plaintiff seems to be arguing that the interactive process broke down. It is true that plaintiff's physician declined to agree that the accommodations plaintiff requested would help plaintiff. Nonetheless, as noted above, defendant provided a reasonable accommodation, which is what it was required to do. The interactive process is not an end in itself. *See Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 683 (7th Cir. 2014).

Plaintiff also seems to be arguing that he should have been given assistance with typing. The Court disagrees. First, if plaintiff was slow at typing, he has put forth no evidence suggesting his slow typing was a result of his leg amputations. *See Taylor-Novotny*, 772 F.3d at 493 ("[Plaintiff] never identified any limitation related to her disability that this accommodation would alleviate."). Second, plaintiff never asked for that kind of help. In fact, he testified that the reason he never asked for help typing was that Nationwide provided voice-recognition software for that purpose.

Finally, plaintiff seems to be arguing that defendant should have accommodated him by allowing him not to attend court hearings. This argument is untenable primarily because representing clients in court was an essential function of plaintiff's position as a trial attorney. An employer is not required to reassign essential functions to another person, because that is not a *reasonable* accommodation, as a matter of law. *Majors v. General Elec. Co.*, 714 F.3d 527, 535 (7th Cir. 2013) ("The accommodation [plaintiff] seeks—another person to perform the essential functions of the job she wants—is, as a matter of law, not reasonable[.]"); *Gratzl*, 601 F.3d at 680 ("An employer need not create a new job or strip a current job of its principal duties to accommodate a disabled employee.").

As the Seventh Circuit explained in *Brown*, in concluding that working away from unruly students was not a reasonable accommodation for an assistant principal, "sometimes a job

function requires a specific work environment.  Lawn maintenance cannot be performed indoors; a jockey must often work atop a horse; receptionists must be near office visitors." *Brown*, 855 F.3d at 826; *see also Webb v. Clyde L. Choate Mental Health and Dev't Center.*, 230 F.3d 991, 999-1000 (7th Cir. 2000) (holding that a psychologist's request not to counsel violent or infectious patients was not a reasonable accommodation, because treating those individuals was an essential function of the job).  Likewise, the work of a trial attorney requires going to court. Defendant assigned only one attorney to each case, and only an attorney can represent clients in court.  So, it is not surprising that defendant's job description for Trial Attorney III included "representing clients in trials and hearings."  This Court "presume[s] that an employer's understanding of the essential functions of the job is correct, unless the plaintiff offers sufficient evidence to the contrary." *Gratzl*, 601 F.3d at 679; 42 U.S.C. § 12111(8).  The fact that defendant allowed attorneys to cover each other's routine status hearings in order to avoid sending multiple attorneys to a single courthouse on a single morning does not create an issue of fact as to whether it was an essential function of a Trial Attorney at Nationwide to represent clients in court for substantive hearings.  No reasonable jury could conclude that representing clients in court was not an essential function of plaintiff's job.  Accordingly, neither eliminating that function from plaintiff's position nor reassigning it to another attorney was reasonable as a matter of law.

For these reasons, the Court concludes that no reasonable jury could find that defendant failed to provide a reasonable accommodation.  Defendant is entitled to judgment as a matter of law on Count I.  The Court grants defendant's motion for summary judgment as to Count I and denies plaintiff's motion for summary judgment as to Count I.

**B.     Disparate treatment under the ADA**

The ADA makes it unlawful to "discriminate against a qualified individual on the basis of disability in regard to . . . the . . . discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Plaintiff claims that defendant discharged him on the basis of his disability. The Seventh Circuit has concluded proof of a discharge "on the basis of disability" means disability was the but-for cause. *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019). Thus, to prevail on this claim, plaintiff must show: (1) he is disabled; (2) he "was qualified to perform the essential functions with or without a reasonable accommodation;" and (3) disability was the but-for cause of his discharge. *Scheidler*, 914 F.3d at 541. The parties seem to disagree that plaintiff is disabled within the meaning of the statute.

Defendant argues that plaintiff is not a qualified individual with a disability, because representing defendant in court was an essential function of plaintiff's job. The Court agrees, as explained above, that representing defendant in court was an essential function of plaintiff's job. The Court cannot agree, however, that plaintiff was unable, as a matter of law, to perform that function. It is undisputed that plaintiff, in fact, attended court hearings regularly—sixteen times, in fact, between March 11, 2015 and May 8, 2015. Because of his disability, however, it took plaintiff longer to get to court (and to walk between courtrooms), which ate up more of his work day and left him tired. That is one reason why the accommodations plaintiff requested and defendant provided—working from the Lombard office and, sometimes, from home—were reasonable: less commuting time meant more time for performing work and for rest.

Finally, the Court concludes that plaintiff has put forth sufficient evidence from which a reasonable jury could conclude that he was discharged on the basis of his disability. First, he has put forth evidence that a similarly-situated employee, Januszkiewicz, who did not have a

disability, was treated more favorably.  Although defendant argues Januszkiewicz was not similarly-situated, the Court disagrees.  He was an attorney who reported to the same supervisor as plaintiff and was subject to the same standards (including billable hour requirements and metrics requirements) as plaintiff.  Plaintiff has also put forth evidence that Januszkiewicz was given far more than a year to improve his performance and was not discharged, while plaintiff was given only a few months before he requested accommodations and a few weeks after he received his accommodations to improve his performance before he was discharged.

Defendant argues that "a history and record of poor job performance" is a legitimate, non-discriminatory reason for discharge, but that history and record occurred *before* defendant provided a reasonable accommodation.  A reasonable jury could conclude that defendant, *after* it provided a reasonable accommodation (which it knew plaintiff needed), discharged plaintiff on the basis of his inability to keep up with his work (due to his disability) *before* defendant provided a reasonable accommodation.  *Cf. Equal Employment Opportunity Comm'n v. Dolgencorp, LLC*, 899 F.3d 428, 435 (6th Cir. 2018) ("[A] company may not illegitimately deny an employee a reasonable accommodation to a general policy and use that same policy as a neutral basis for firing him.  Imagine a school that lacked an elevator to accommodate a teacher with mobility problems.  It could not refuse to assign him to classrooms on the first floor, then turn around and fire him for being late to class after he took too long to climb stairs between periods.").  Before defendant provided a reasonable accommodation, Schneider regularly criticized plaintiff for not achieving 90 on his KPIs, which were, among other things, evaluations of whether plaintiff performed designated tasks by designated deadlines, i.e., whether he was getting his work done quickly enough.  Plaintiff put forth evidence that one of the reasons he was behind was that, because of his disability, it took him longer to get to and from court.  The record

contains no evidence that, once plaintiff's disability was accommodated, he still could not keep up with his work. The record contains no evidence of plaintiff's KPI scores *after* he was provided reasonable accommodations. (The record contains plaintiff's KPI score for all of 2015, but not for the time period after plaintiff received his accommodations in March.) On the other hand, a reasonable jury could also conclude defendant discharged plaintiff for reasons other than his disability.

Defendant has not shown it is entitled to judgment as a matter of law on Count II. It's motion for summary judgment as to Count II is denied. Plaintiff, too, has failed to show he is entitled to judgment as a matter of law on Count II. His motion for summary judgment as to Count II is denied.

### C. Retaliation

In Count III of his complaint, plaintiff alleges that defendant retaliated against him when it terminated his employment after he requested a reasonable accommodation. Defendant moved for summary judgment on this count, arguing that plaintiff has not put forth evidence of a causal connection between his discharge and his request for accommodation and noting, among other things, that plaintiff did not request an accommodation until *after* defendant gave plaintiff a final written warning that his employment would be terminated in 45 days if his performance did not improve.

Plaintiff has not responded to defendant's motion for summary judgment on the retaliation claim and has not mentioned the retaliation claim in his briefs, including his brief in support of his own motion for summary judgment. Accordingly, plaintiff's retaliation claim is deemed abandoned. *See Little v. Mitsubishi Motors North Amer., Inc.*, 261 Fed. Appx. 901, 903 (7th Cir. 2008) (failure "to present facts or develop any legal arguments" in response to motion

for summary judgment constituted abandonment of claims); *see also Burton v. Board of Regents of the Univ. of Wis. Sys.*, 851 F.3d 690, 695 (7th Cir. 2017) ("[I]t is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered. If the [nonmoving party] does not do so, and loses the motion, it cannot raise such reasons on appeal.") (citations omitted). In any case, the Court agrees with defendant that plaintiff has not put forth evidence from which a reasonable jury could find that he was discharged in retaliation for having requested accommodations.

Defendant's motion for summary judgment as to Count III is granted.

## IV. CONCLUSION

For all of these reasons, the Court denies plaintiff's motion for summary judgment [126]. The Court grants in part and denies in part defendant's motion for summary judgment [111]. Defendant is granted summary judgment as to Counts I and III. This case is set for status hearing on July 24, 2019 at 9:30 a.m.

SO ORDERED.                                    ENTERED: June 3, 2019

_____
JORGE L. ALONSO
United States District Judge

21